# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN H. KIHM, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0938-MTZ |
| DAVID M. MOTT, LEON O. MOULDER, DR. MARY LYNNE HEDLEY, TIMOTHY R. PEARSON, KAVITA PATEL, LAWRENCE M. ALLEVA, GARRY A. NICHOLSON, PASCALE WITZ, DR. BETH SEIDENBERG, NEW ENTERPRISE ASSOCIATES 13, L.P., NEA PARTNERS 13, L.P., NEA 13 GP, LTD, NEA 15 OPPORTUNITY FUND, L.P., NEA PARTNERS 15-OF, L.P., NEA 15 GP, LLC, NEW ENTERPRISE ASSOCIATES, INC., NEA MANAGEMENT COMPANY, LLC, CITIGROUP, INC., and CITIGROUP GLOBAL MARKETS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted:  May 11, 2021
Date Decided:  August 31, 2021

Joel Friedlander and Jeffery M. Gorris, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; R. Bruce McNew, COOCH & TAYLOR, P.A., Wilmington, Delaware; Randall J. Baron and David Wissbroecker, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Peretz Bronstein, BRONSTEIN, GEWIRTZ & GROSSMAN, LLC, New York, New York, *Attorneys for Plaintiff.*

A. Thompson Bayliss and April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Peter L. Welsh and Elena Weissman Davis, ROPES & GRAY LLP, Boston, Massachusetts; Timothy R. Farrell, ROPES & GRAY LLP, Chicago, Illinois; Christian Reigstad, ROPES & GRAY LLP, New York, New York, *Attorneys for Defendants David M. Mott, Leon O. Moulder, Dr. Mary Lynne Hedley, Timothy R. Pearson, Kavita Patel, Lawrence M. Alleva, Garry A. Nicholson, Pascale Witz, and Dr. Beth Seidenberg.*

Paul D. Brown and Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Roger A. Lane and Courtney Worcester, HOLLAND & KNIGHT LLP, Boston, Massachusetts, *Attorneys for Defendants New Enterprise Associates 13, L.P., NEA Partners 13, L.P., NEA 13 GP, LTD, NEA 15 Opportunity Fund, L.P., NEA Partners 15-OF, L.P., NEA 15 GP, LLC, New Enterprise Associates, Inc., NEA Management Company, LLC.*

Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Bruce Birenboim, Susanna M. Buergel, and Christopher L. Filburn, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP, New York, New York, *Attorneys for Defendants Citigroup, Inc. and Citigroup Global Markets, Inc.*

**ZURN, Vice Chancellor.**

In December 2018, the board of a public oncology company agreed to sell the company to a major multinational pharmaceutical conglomerate in a cash tender offer with a second-step merger. With the benefit of books and records obtained in an action brought under 8 *Del. C.* § 220, a former stockholder in the target company brought this post-closing class action complaint for damages, alleging the acquisition was the product of actionable breaches of fiduciary duty by the company's directors. The plaintiff challenges the sale process as rushed and inadequate; he also challenges the sale's timing.

According to the plaintiff, the company's long-time private equity sponsor favored a near-term sale so that it could exit its position, cash out its investors, and facilitate raising an important upcoming fund. In the complaint, the private equity sponsor is everywhere and nowhere: the plaintiff offers pages of allegations about the sponsor's motivations, but does not assert the sponsor was a controlling stockholder, nor that the sponsor or any of its agents had any specific role in the flawed sale process. Instead, the plaintiff pins those flaws on the target's financial advisors and its managers.

The target's board ultimately recommended its stockholders tender their shares at the agreed-upon price of $75 per share, representing a 182% premium over the stock's unaffected trading price. In support of its recommendation, the board issued an eighty-page disclosure statement discussing the proposal, including

1

fairness opinions from two financial advisors. An overwhelming majority of the company's stockholders chose to tender their shares; the acquisition closed in January 2019.

On this motion to dismiss, the defendants—members of the target's board, its financial advisor, and the private equity sponsor—seek to "cleanse" the transaction under *Corwin v. KKR Financial Holdings LLC*.[1] This Court has observed the rhythm of post-closing shareholder litigation: defendants hope to secure judicial deference by pointing to a majority stockholder vote, then plaintiffs seek more rigorous review by arguing a controlling stockholder or an uninformed vote places the transaction beyond *Corwin*'s reach.[2] But the plaintiff stops short of alleging the target's private equity sponsor was a controlling stockholder. Having declined to argue the tender offer was coercive, the plaintiff is left with a single path to avoid *Corwin*: alleging the target's disclosures were inadequate and the stockholders uninformed. He points to four omissions from the company's recommendation statement, which he argues make the disclosures deficient. After careful consideration, I conclude that none of those claims are meritorious. Because I am satisfied that a fully-informed,

---

[1] 125 A.3d 304 (Del. 2015), *aff'g In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980 (Del. Ch. 2014).

[2] *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *1–2 (Del. Ch. May 25, 2021).

uncoerced majority of the target's shareholders ratified the transaction, I grant the pending motions to dismiss in full.

## I.     BACKGROUND[3]

Plaintiff John Kihm ("Plaintiff") is a former stockholder of Tesaro Inc. ("Tesaro" or the "Company"). Plaintiff's Verified Class Action Complaint (the "Complaint") alleges breaches of fiduciary duty in connection with the January 2019 cash sale of Tesaro to GlaxoSmithKline, plc ("GSK") for $75 per share, or approximately $5.1 billion (the "Acquisition").

### A.     Tesaro Raises Financing, Goes Public, Develops Its Flagship Product, And Considers A Sale.

Tesaro is an oncology-focused biopharmaceutical company. It was founded in March 2010 by defendants Leon Moulder and Dr. Mary Lynne Hedley. Tesaro's initial financing primarily came from a private equity company called New Enterprise Associates, Inc. ("NEA Parent"). NEA Parent invests through its

---

[3] On this motion to dismiss, I draw the following facts from plaintiff's Verified Class Action Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Mason Decl. —" refer to the exhibits attached to the Transmittal Declaration Pursuant to 10 *Del. C.* § 3927 of Daniel A. Mason in Support of Opening Brief of Citigroup Inc. and Citigroup Global Markets Inc. in Support of Their Motion to Dismiss the Verified Class Action Complaint, available at D.I. 26. Citations in the form of "Kirby Decl. —" refer to the exhibits attached to the Declaration of April M. Kirby, Esq. in Support of the Opening Brief in Support of Director and Officer Defendants' Motion to Dismiss, available at D.I. 30.

affiliated funds, including New Enterprise Associates 13, L.P.; NEA Partners 13, L.P.; NEA 13 GP, LTD (together, "NEA 13"); NEA 15 Opportunity Fund, L.P.; NEA Partners 15-OF, L.P.; and NEA 15 GP, LLC (together, "NEA 15," and with NEA 13 and NEA Parent, "NEA").[4]  NEA continued to invest in Tesaro, and has been the Company's dominant venture capital investor.  Through cumulative investments of at least $58 million, NEA held 50.3% of Tesaro's common stock by May 2012.

In June 2012, Tesaro went public via an initial public offering (the "IPO"). After the IPO, NEA held 43.1% of Tesaro's common stock; NEA's stake declined to 35.3% in 2013, 27.4% in 2014, 24.6% in 2015, 23% in 2016, and 19% in 2017 after a series of secondary offerings and private placements.  NEA maintained its 19% stake until the Acquisition, the largest stake among Tesaro's private equity backers.

During the relevant time period, Tesaro's primary product was Zejula, the brand name for Niraparib, a medicine that interferes with the growth and spread of cancer cells by operating as a "PARP inhibitor."[5]  In March 2017, the FDA approved

---

[4] At the time of the Acquisition, NEA 13 owned 9,681,039 shares of Tesaro stock, through New Enterprise Associates 13, L.P.  NEA 15 owned 739,516 shares, through NEA 15 Opportunity Fund, L.P.  NEA Management Company, LLC, the ultimate parent of the entities in the NEA organization, is also a Defendant.

[5] According to the Complaint, a "PARP inhibitor [is] a group of pharmacological inhibitors of the enzyme poly ADP ribose polymerase.  PARP inhibitors inhibit DNA repair in cancer cells that are damaged through radiation therapy."  Compl. ¶ 114.

Niraparib for treatment of epithelial ovarian, fallopian tube, and primary peritoneal cancer. Zejula became the leading PARP inhibitor in ovarian cancer treatment. It also had the potential to expand to other uses. According to the Complaint, PARP inhibitors may also be effective in treating other types of cancer and other life-threatening diseases. Tesaro marketed Zejula in the United States and in several European Union countries, and planned to expand into Israel and Canada.

Tesaro's board of directors (the "Board") began exploring outside financing in early 2017. The Board retained Defendant Citigroup Inc. (together with its affiliate, Defendant Citigroup Global Markets, Inc., "Citi") to advise on a potential sale; Christopher Hite was among the Citi bankers involved. Citi regularly provided investment banking services to Tesaro. Citi's non-public solicitation process lasted from March to June 2017.[6] Though Citi had discussions with four potential acquirers, the process concluded without securing a sale.[7] GSK was not among the companies contacted as part of that process, as it was not then seen as a likely acquirer.[8]

---

[6] Kirby Decl. Ex. P at 16–17; *see also* Compl. ¶ 77.

[7] Kirby Decl. Ex. P at 16–17; *see also* Compl. ¶ 77.

[8] Kirby Decl. Ex. P at 17.

**B.** **Tesaro's Stock Price Drops, Causing Problems For NEA.**

Tesaro's stock price fluctuated throughout 2017 and into 2018. It hit its all-time high, over $190 per share, on February 1, 2017. After the sale conversations fell through, the stock price steadily declined. It fell to $120 per share in September 2017 and dropped to $70 per share in early 2018. By August 2018, when the Board was once again considering financing options, the price had dropped to $30 per share. It remained around that level until the Acquisition was announced, when it spiked.

Tesaro's plummeting stock price was bad for all investors, but allegedly hit NEA particularly hard. In 2018, NEA was working on raising its next and biggest fund, "NEA 17." NEA invested in Tesaro primarily through NEA 13, which was of the 2009 vintage. NEA 13's performance was particularly important in 2018. The Complaint explains the process of evaluating funds, including why NEA 13 was critical to NEA's 2018 fundraising efforts, in extensive detail.[9] For now, it is enough to say that NEA 13 would be closely scrutinized by potential NEA 17 investors, and would therefore affect the volume of investment—and the fee NEA could charge. Though some commentators considered NEA a second-tier venture capital firm, it charged its investors a "super premium" 30% "carry" fee, typically only available to

---

[9] *See, e.g.*, Compl. ¶¶ 81–113.

the very best firms.[10]  To justify that exceptional fee for NEA 17, NEA 13 needed

exceptional returns, including from Tesaro.

At the end of 2017, NEA 13's performance as compared to other funds of its

vintage was "solidly above median . . . but not quite upper quartile."[11]  These above-

average, if unspectacular, returns were aided in part by Tesaro's strong performance.

When Tesaro's stock price plummeted in 2018, so did NEA 13's performance; by

fall 2018, NEA 13's returns were on track to drop below the median by the end of

the year.  Without a change in fortunes, "NEA would have no realistic chance to

charge super-premium carry" on its NEA 17 fund, which was set to begin

fundraising in early 2019.[12]  According to Plaintiff, this created a strong incentive

for NEA to liquidate its investment in Tesaro.

### C.    Tesaro's Board Considers Financing And A Sale.

Despite the company's declining stock price, Tesaro's internal projections

were bullish on Zejula and Tesaro's ability to expand into other cancer drugs.  Tesaro

used two sets of internal operating plans to guide operations:  its short-term operating

plan, known as the Annual Operating Plan ("AOP"), updated once a year; and its

long-term strategic plan, known as the Long Range Plan ("LRP"), updated

---

[10] *Id.* ¶ 90.

[11] *Id.* ¶ 97.

[12] *Id.* ¶ 105.

constantly on a more *ad hoc* basis. In February 2018, the Board approved Tesaro's 2018 AOP. It then reviewed an updated LRP in August 2018. The LRP focused on expanding Tesaro's business into lung, gynecological, and breast cancers, and predicted that the company could launch up to thirteen new drugs by 2023. Based on these advances, the LRP projected 2025 "Global Base Case Revenues" between $2 billion and nearly $5 billion on a risk-adjusted basis. A revised November 2018 LRP projected between $4.578 and $4.615 billion in risk-adjusted revenues by 2028 (the "November LRP").[13]

These lofty goals depended on Zejula's continued development and expansion into new patient bases. Pending clinical trials to broaden Zejula's uses looked promising. If they proved successful, as the Board predicted, Zejula's market would dramatically expand. To fund the Company's expansion, the LRP called for additional financing. While Tesaro's projected funding needs varied, the highest estimates (based on the "all in" LRP) showed the company would need $285 million of new money in 2019, and $225 million in 2020. These estimates were presented to the Board in August 2018.

The Tesaro Board considered several fundraising options throughout 2018. In March 2018, the Board began exploring potential co-development and co-promote

---

[13] The November LRP projections eventually became part of an updated AOP, presumably for use in 2019.

collaborations on Zejula. These discussions initially spurred three proposals: a joint venture to develop one of Tesaro's proprietary molecules in China ("Chinese NewCo"), a Zejula collaboration with Bristol Myers Squibb ("BMS" and the "BMS Collaboration"), and a royalty deal on Zejula with Royalty Pharma (the "RP Royalty"). The Board would ultimately elect to pursue the Acquisition.

### 1. Tesaro's Board And Officers

At the time it considered these options, Tesaro's Board was allegedly intertwined with other NEA portfolio companies and NEA itself, although Plaintiff stops short of asserting NEA was a controlling stockholder. Eight of Tesaro's ten directors at the time of the Acquisition are defendants in this action.

Tesaro's founders, Moulder and Hedley, sat on the company's pre-Acquisition Board. The two founders also had key executive roles: Moulder was Tesaro's CEO, and Hedley was its president and COO. Through the Acquisition, the founders received substantial compensation—well over $100 million each—for their Tesaro shares, options, and restricted stock units.[14] Both also received multi-million dollar "golden parachute" compensation packages.[15] After the Acquisition, Hedley stayed in her role as president and COO of Tesaro, and Moulder became an

---

[14] *See* Compl. ¶¶ 13 (alleging Moulder received $155,854,551), 19 (alleging Hedley received $112,500,429).

[15] *See id.* ¶¶ 13 (alleging Moulder received ($10,997,196), 19 (alleging Hedley received $8,770,318).

NEA venture advisor. Both founders have served and continue to serve on the boards of other NEA-backed biopharmaceutical companies.

Defendant David Mott became the Board's chairperson in July 2011, shortly after the Company was founded. He remained in that role until the Acquisition. Throughout this period, Mott was a general partner at NEA, and led NEA's $1 billion health care investment practice. The Complaint emphasizes Mott's role at NEA to support Plaintiff's that NEA's divergent interests drove the Acquisition.[16]

Several other Tesaro Board members also have ties to NEA. Defendant Dr. Kavita Patel, who joined the Board in 2016, has been a venture partner at NEA since 2017 and also serves on the boards of two NEA-backed companies.[17] Tesaro directors Lawrence M. Alleva, Garry A. Nicholson, and Pascale Witz also sat on boards of other NEA portfolio companies. Patel, Alleva, Nicholson, and Witz each received over $1 million for their Tesaro shares and options in connection with the Acquisition. The final Board member Defendant is Dr. Beth Seidenberg, who was also a partner at another private equity investor in Tesaro, nonparty Kleiner Perkins

---

[16] *E.g.*, *id.* ¶¶ 69–70 (alleging that "Mott's conduct served to benefit each of the NEA Defendants" and attributing Mott's conduct and knowledge to "all of the NEA Defendants"). While the Complaint alleges that Mott and NEA cashed out for a combined $782 million, plus $1.7 million for stock options, it appears that the vast majority of this payment went to NEA and not Mott individually. *See* Kirby Decl. Ex. P at 6.

[17] The Complaint alleges that Patel's relationship with NEA was not disclosed, but do not argue that this omission was material.

10

Caufield & Byers ("Kleiner Perkins"). Seidenberg has served on other boards with Mott, and Kleiner Perkins has "deep co-investment relationships" with NEA.[18]

In addition to the Board members, the Complaint also names Timothy R. Pearson, Tesaro's CFO, as a defendant. Pearson was Mott's colleague at MedImmune, Inc., a company Mott founded in 1988. Allegedly as a result of his relationship with Mott, Pearson had lucrative board seats at two other NEA-backed biopharmaceutical companies. Pearson owned Tesaro stock and received over $11 million in cash compensation, plus over $4 million as a golden parachute, in connection with the Acquisition.

This opinion refers to Moulder, Hedley, Mott, Patel, Alleva, Nicholson, Witz, Seidenberg, and Pearson as the "Individual Defendants."

### 2. Alternatives To The Acquisition

The Chinese NewCo transaction was presented to the Board in May 2018. The proposal contemplated that the new company would market TSR-042, one of Tesaro's many proprietary molecules, for multiple uses in China. The Chinese NewCo transaction would provide Tesaro with $80 million of expense relief and represented $228 million in value to Tesaro through 2021. The new company was projected to go public in two to three years, with Tesaro owning approximately 25% of that entity. On October 20, the Board authorized management to enter into the

_____

[18] Compl. ¶ 57.

11

Chinese NewCo transaction in its discretion. Board discussion on the transaction continued through at least November 8.

The other two proposals were substantially larger in scope, and would have solved Tesaro's projected cash crunch for at least 2019 and 2020. The BMS Collaboration proposed to market all uses of Zejula, except the treatment of prostate cancer, in all nations except Japan, South Korea, Taiwan, Russia, Australia, and China. Tesaro would receive upfront consideration of $700 million, as well as up to $640 million at developmental milestones, and up to $1 billion at commercial milestones. It would have also obtained a license to several of BMS's related patents. Finally, the RP Royalty proposal would have provided $800 million in upfront financing and royalties on worldwide future revenues of Zejula and three of Tesaro's proprietary molecules.

On August 17, the Board's financing committee met and considered the proposals. It concluded that the RP Royalty transaction was "the most viable and attractive" alternative to bridge any cash gap.[19] But as the Complaint explains, both transactions would have created hurdles to a potential sale of the company. The BMS Collaboration would have ceded partial control of Tesaro's future to a proposed Joint Development Committee, which would have made a change-in-

---

[19] *Id.* ¶ 148.

control transaction for Tesaro "virtually impossible."[20]  The RP Royalty deal included a change-of-control penalty between $1.4 billion and $2.4 billion.  Despite these drawbacks, discussions on the BMS Collaboration continued through November 5, and discussions on the RP Royalty transaction continued through November 19.  In the fall of 2018, Tesaro management publicly maintained that the Company intended to obtain financing through partnerships, not the public capital markets.

### 3.    *The Acquisition*

The Complaint alleges NEA and Mott favored selling Tesaro over obtaining more financing, in order to boost NEA 13's performance and support NEA 17 fundraising efforts and fees.  Plaintiff broadly contends NEA favored and "engineered" the Acquisition by the end of 2018, without specifically identifying any particular action.[21]

Plaintiff alleges the Acquisition conversations began not with the Board, but with management and Citi.  Citi was both Tesaro's banker and GSK's principal relationship banker.  Specifically, Hite also worked on a multi-billion-dollar joint venture between GSK and Pfizer (the "GSK/Pfizer JV"), which was being negotiated

---

[20] *Id.* ¶ 150.

[21] *See* Compl. ¶ 230.  As discussed *infra*, this allegation is unsupported and conclusory.

around the same time as the Acquisition. Hite was no longer involved with the GSK/Pfizer JV by the time GSK made its first offer.[22]

Around June 2018, Hedley reached out to GSK's Chief Scientific Officer and R&D president to discuss a co-development or co-promote on Zejula. The Complaint alleges such a collaboration would have been unlikely, given that GSK did not have an oncology platform. Plaintiff alleges, on information and belief, that these discussions were solely to transfer confidential due diligence about Tesaro to make it a more appealing acquisition target.

Around the same time, Hite mentioned Tesaro to GSK as a potential component of a broader acquisition strategy. Citi had routine strategic discussions with GSK. Citi identified and screened "all biotech companies that had greater than $500 million in revenue in 2024, focused on oncology, [whose] products were not substantially partnered," based on publicly available information.[23] In one such strategic discussion in June 2018, before the Tesaro Board had considered any acquisition by GSK, Hite presented GSK with public marketing valuation materials on Tesaro that he had prepared with Tesaro management.[24] Citi presented several analyses of acquiring multiple smaller companies in a "string of pearls" scenario,

---

[22] Kirby Decl. Ex. M at 6.

[23] Kirby Decl. Ex. M at 5; *see* Compl. ¶ 158.

[24] Kirby Decl. Ex. M at 5–6; *see* Compl. ¶ 158.

and included Tesaro as a "pearl" in one of the analyses.[25] These materials did not suggest any particular transaction or a standalone purchase of Tesaro.[26]

Throughout that summer, Tesaro negotiated with GSK and others about a potential collaboration on Zejula.[27] On September 24, Hite met with GSK's CFO Scott Dingemans to discuss GSK making an offer to buy Tesaro.

At a September 27 meeting of the Board's financing committee, Hite and Citi presented Tesaro's financing alternatives and advised that the RP Royalty transaction resulted in the best value to shareholders, "assuming [Tesaro] remains independent."[28] Hite did not mention a potential GSK acquisition at the September 27 financing committee meeting, but the next day, he informed the Board of his discussions with Dingemans and GSK's desire to discuss an acquisition proposal. At that September 28 meeting, the Board "authorized management to . . . inform [GSK] that the Company would consider an acquisition proposal for the entire company from it."[29] Throughout October, the Board continued to consider financing

---

[25] Kirby Decl. Ex. M at 5–6; *see* Compl. ¶ 158.

[26] Kirby Decl. Ex. M at 6; *see* Compl. ¶ 158.

[27] Though Plaintiff characterizes the co-development or co-promote discussions between Tesaro and GSK as a screen for transferring due diligence in furtherance of an acquisition, *see* Compl. ¶ 161, Plaintiff also alleges that no offer was made at this time because "discussions between Tesaro and GSK had focused exclusively on a potential co-development/co-promote collaboration respecting Zejula." *Id.* ¶ 160.

[28] *Id.* ¶ 162.

[29] *Id.* ¶ 163.

15

alternatives. On October 20, it authorized management to enter into the Chinese NewCo transaction.

On October 24, GSK made its initial proposal to acquire Tesaro for $66 in cash per share. GSK indicated that it planned to keep Tesaro's current management and "organizational independence."[30] The Board rejected GSK's offer on October 29 and continued negotiating with BMS. It retained Citi and Centerview Partners LLC ("Centerview") as financial advisors to advise on the sale process.[31] Its engagement letter with Citi provided for a $44 million total payment upon closing the Acquisition, with no money owed if talks never reached the fairness opinion stage. Without Board authorization, Citi reached out to seven potential strategic buyers.

In November, the Board learned that Tesaro management was working on an update to the LRP (the "November LRP"). Management also prepared alternative forecasts, referred to respectively as "Case A" and "Case B."[32] At the November 8 Board meeting (the "November 8 Meeting"), Pearson explained these projections to the Board and explained that Citi and Centerview would use Case A and Case B to evaluate a potential acquisition. Case A was the "base case," and Case B was the

---

[30] *Id.* ¶ 165.

[31] At various points, the Board also retained Hogan Lovells US LLP and Ropes & Gray LLP as legal advisors. Kirby Decl. Ex. P at 18, 21.

[32] *See id.* at 24, 60; Compl. ¶ 191.

16

"low case."[33]  The November LRP differed from Case A only in that it included two projected revenue streams from Zejula—treating breast cancer and a certain type of ovarian cancer known as "platinum resistant ovarian cancer" or "PROC"—that Case A omitted.  Overall, the November LRP projects roughly 7.05% higher revenue as of 2028 than Case A.

Citi assumed that Case A would require $855 million in financing, and that Case B would require $1.19 billion in financing.  Based on these and other assumptions, Citi and Centerview presented preliminary valuation analyses at the November 8 Meeting for both Case A and Case B.  Citi provided both discounted cash flow ("DCF") and sum-of-the-parts ("SOTP") analyses, while Centerview presented only one estimate for each case, apparently based on a DCF analysis.[34]  The following table summarizes those ranges on a per-share basis:[35]

| | **Citi DCF** | **Citi SOTP** | **Centerview** |
|---|---|---|---|
| **Case A** | $68.96 to $106.07 | $51.75 to $92.25 | $79.60 to $95.95 |
| **Case B** | $46.12 to $70.63 | | $52.15 to $64.10 |

---

[33] Compl. ¶¶ 177–78.

[34] Compl. ¶ 182.  While the Complaint says Centerview presented "DCF/SOTP ranges," Centerview's fairness opinion appears to only employ a DCF analysis.  *Compare* Compl. ¶ 182, *with* Kirby Decl. Ex. P at 44.

[35] The Complaint does not break Citi's SOTP analysis into Case A and Case B.  *See* Compl. ¶ 182.

Citi and Centerview also presented per-share valuation ranges for the BMS Collaboration and the RP Royalty proposals:[36]

|  | Citi | Centerview |
|---|---|---|
| **BMS Collaboration** | $51.52 to $83.58 | $47.00 to $85.00 |
| **RP Royalty** | $58.11 to $87.39 | N/A |

Also at the November 8 Meeting, Citi presented materials regarding its conflict with GSK. According to the minutes from that meeting, Hite reviewed Citi's relationship with GSK, including detail about its prior and current engagements and the fees associated.[37] A "[d]iscussion followed, during which [] Hite answered questions from the Board."[38]

On November 16, Bloomberg published an article reporting that Tesaro was in acquisition discussions. Public speculation caused the stock price to rise by over $20 per share.

On November 18, Citi reported that no buyer other than GSK had emerged. It also delivered a revised bid from GSK for $69 per share, with a two-week exclusive negotiating period. The Board proposed that it would agree to exclusivity if GSK raised its bid by fifteen to twenty percent. On November 21, GSK raised its

---

[36] These ranges include both Case A and Case B projections. Centerview's valuation range for the RP Royalty transaction is not in the Complaint or in Plaintiff's brief. *See id.* ¶ 183; D.I. 38 at 27.

[37] Mason Decl. Ex. 8 at 5. *But see* Compl. ¶ 170 ("The minutes contain no detail of this discussion.").

[38] Mason Decl. Ex. 8 at 5.

offer to $75 per share in response, which Dingemans characterized as its "best and final offer."[39]  The Board met later that day with its financial and legal advisors. After deliberating, the Board agreed to exclusivity and the parties began drafting a merger agreement (the "Merger Agreement").[40]

On November 29, Citi presented information about its conflicts of interest to the Board (the "Conflict Presentation").[41]  Notably, it discussed Hite's June 2018 presentation to GSK.

---

[39] Kirby Decl. Ex. P at 25; *see also* Compl. ¶ 173.

[40] Kirby Decl. Ex. P at 25–26.

[41] Kirby Decl. Ex. M.  The Complaint alleges this meeting took place December 2.  *See* Compl. ¶ 174.  This is inconsistent with the Conflict Presentation itself, which is dated November 29.  *See* Kirby Decl. Ex. M.  Plaintiff appeared to back off this position in briefing.  *See* D.I. 38 at 3.  In either case, the Board saw the Conflict Presentation before it issued the Recommendation Statement.

Chris Hite is the senior Citi member of the [GSK] coverage team and as such regularly has strategic discuss[ions] with [GSK] concerning M&A and capital structure. In connection with such discussions, in June 2018, Chris Hite reviewed materials labeled "Preliminary draft subject to further discussion and revision" with GSK that included a screen of all biotech companies that had greater than $500 million in revenue in 2024, focused on oncology, and where their products were not substantially partnered. The preliminary draft materials also included a general overview of the biopharma landscape, including public information overviews of [Tesaro] and multiple other industry participants. The preliminary draft materials also had hypothetical acquisitions of two larger biotech companies compared to a hypothetical acquisition of three smaller companies that was termed a "string of pearls" scenario. In this hypothetical analysis, the three companies in the string of pearls analysis were aggregated together in order to compare to the larger acquisition scenarios. . . . In one version of the preliminary draft materials, [Tesaro] was included as one of the companies aggregated into the string of pearls. No individual hypothetical acquisition analysis of [Tesaro] alone was included in the preliminary draft materials. Any references to [Tesaro] were based solely on public information.[42]

Citi also disclosed to the Board its role in advising GSK on a "confidential, unrelated non-pharmaceutical strategic transaction," which was the GSK/Pfizer JV.[43]

---

[42] Kirby Decl. Ex. M at 5–6.

[43] Kirby Decl. Ex. M at 6.

20

On December 2, Citi and Centerview presented their opinions that the Acquisition was fair to Tesaro stockholders from a financial point of view.[44] In connection with their fairness opinions, Citi and Centerview provided final valuation ranges. These were nearly identical to those presented at the November 8 Meeting, with Citi's adjusted slightly up and Centerview's adjusted slightly down:[45]

|         | Citi DCF            | Citi SOTP           | Centerview DCF      |
|---------|---------------------|---------------------|---------------------|
| Case A  | $69.52 to $107.00   | $52.25 to $93.00    | $79.45 to $95.85    |
| Case B  | $46.38 to $71.14    |                     | $51.95 to $63.95    |

After considering recommendations from Citi, Centerview, and legal advisors, the Board unanimously voted to approve the Acquisition at $75 per share. This represented a 182% premium to the stock's price on November 15, the last full trading day before Bloomberg reported Tesaro was considering a merger.

On the morning of December 3, GSK's board met to review the Acquisition, and authorized GSK to enter into the Merger Agreement governing a tender offer followed by a second-step merger under 8 *Del. C.* § 251(h).[46] The parties executed the Merger Agreement and publicly announced the Acquisition that morning before NASDAQ trading opened.[47] The Acquisition was set to close in January 2019.

---

[44] *See* Kirby Decl. Ex. P at 26; *see also* Compl. ¶ 174.

[45] *See* Compl. ¶ 184; Kirby Decl. Ex. P at 35.

[46] *See* Kirby Decl. Ex. P at 27.

[47] *See id.*

21

On December 14, Tesaro filed its Schedule 14D-9, recommending that stockholders tender their shares (the "Recommendation Statement").[48] The eighty-page Recommendation Statement included eleven pages dedicated to the background of the Acquisition and the negotiations leading up to it.[49] It also disclosed Citi's and Centerview's fairness opinions, potential conflicts of interests, information about Case A and Case B, and the alternative financing transactions the Board explored.

### D.     Plaintiff Seeks Books And Records.

On January 3, 2019, Plaintiff served the Board with a demand to inspect Tesaro's books and records pursuant to 8 *Del. C.* § 220. The purpose of the demand was to investigate potential wrongdoing or mismanagement in connection with the Acquisition, as well several disclosure concerns. The Board rejected Plaintiff's demand, and he filed a complaint in this Court on January 11 (the "Section 220 Action").[50] Aside from Tesaro's answer, filed on February 4, the Section 220 Action's docket sat idle until the Court requested a joint status report in August 2019. The parties eventually agreed to a stipulated production, governed by a

---

[48] *See generally id.*

[49] *See id.* at 16–27.

[50] The Section 220 Action is captioned *Kihm v. Tesaro, Inc.*, C.A. No. 2019-0022-MTZ.

confidentiality agreement, and ultimately agreed to dismiss the case. Plaintiff did not substantively challenge the Acquisition during that time.

### E. Tesaro Stockholders Approve The Acquisition.

The tender offer expired on January 18, 2019. 50,118,797 shares were tendered, representing approximately 82.8% of Tesaro's outstanding shares.[51] GSK acquired the remaining shares through a merger pursuant to Section 251(h) on January 22.

After the Acquisition was announced, NEA promptly began touting it in its marketing materials for NEA 17. The NEA 17 pitchbook emphasized NEA's sustained "top tier returns" and boasted major distributions and a "liquidity engine."[52] It specifically highlighted Tesaro as one of three examples of NEA's growth and success leading to "big outcomes and meaningful impact across sectors."[53] NEA 17 ultimately met its goal to raise $3.6 billion at a 30% super-premium carry. The Complaint alleges that NEA could not have made its claims, or successfully raised NEA 17 with a super-premium carry, without the Acquisition.

---

[51] Kirby Decl. Ex. R at 3.

[52] Compl. ¶¶ 110, 112.

[53] *Id.* ¶ 113.

23

**F.    Plaintiff Files This Action.**

On November 2, 2020, Plaintiff filed his class action Complaint challenging the Acquisition. The Complaint asserts four counts. Count I alleges breaches of fiduciary duty against Moulder, Hedley, and Pearson in their capacities as officers. Count II alleges breaches of fiduciary duty against Mott, Moulder, Patel, Alleva, Hedley, Nicholson, Witz, and Seidenberg in their capacities as directors. Count III alleges NEA aided and abetted the Individual Defendants' breaches. Count IV similarly alleges Citi aided and abetted the Individual Defendants' breaches. On January 20, 2021, Defendants filed three motions to dismiss the Complaint under Court of Chancery Rule 12(b)(6) (the "Individual Defendants' Motion," the "Citibank Motion," and the "NEA Motion," together, the "Motions").[54] The parties fully briefed the Motions and the Court heard oral argument on May 11.[55]

**II.    ANALYSIS**

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

---

[54] D.I. 24; D.I. 27; D.I. 30.

[55] D.I. 65; D.I. 66 [hereinafter "Hr'g Tr."].

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[56]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[57] This standard is "minimal"[58] and "plaintiff-friendly."[59] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[60] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[61] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[62]

---

[56] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020).

[57] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[58] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[59] *See, e.g., Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

[60] *Cent. Mortg. Co.*, 27 A.3d at 536.

[61] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[62] *Trados I*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

The Individual Defendants argue that the fiduciary duty claims in Counts I and II must be dismissed under *Corwin*[63] because a fully informed, uncoerced majority of Tesaro shareholders approved the Acquisition by tendering their shares, and, therefore, the business judgment rule unrebuttably applies. Even if *Corwin* is inapplicable, the Individual Defendants argue that Plaintiff's fiduciary duty counts fail on their merits. NEA and Citi argue that the aiding and abetting claims against them in Counts III and IV must be dismissed for lack of a predicate breach and, in the alternative, because Plaintiff failed to plead knowing participation in any such breach.

### A. Counts I and II: Breach of Fiduciary Duty

Counts I and II allege breaches of fiduciary duty against the Individual Defendants. Because Tesaro stockholders received cash for their shares, the Acquisition is presumptively subject to at least enhanced scrutiny under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[64] But the Acquisition was ratified when a

---

[63] 125 A.3d at 306.

[64] 506 A.2d 173 (Del. 1986); *see Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019) (citing *Revlon*, 506 A.2d at 184); *accord In re Mindbody, Inc.*, 2020 WL 5870084, at *13 (Del. Ch. Oct. 2, 2020) ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*."). Plaintiff theorizes that the Acquisition is subject to entire fairness review because a majority of the Board was not disinterested and independent. D.I. 38 at 60–61. "[E]ven if plaintiffs had pled facts from which it was reasonably inferable that a majority of [Company] directors were not independent, the business judgment standard of review still would apply to the merger because it was approved by a majority of the shares held by disinterested stockholders of [Company] in a vote that was fully informed." *KKR*, 101

26

fully-informed majority of Tesaro stockholders tendered their shares, in the absence of a conflicted controlling stockholder. Thus, under *Corwin*, the business judgment is the appropriate standard of review.[65] Because Plaintiff does not allege waste, his breach of fiduciary duty claims against the Individual Defendants must be dismissed.

*Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders."[66] As Vice Chancellor Glasscock recently explained:

> [*Corwin*] stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule. [67]

To obtain the protection of *Corwin*'s presumption, Defendants must "demonstrate that the [cash-out Acquisition] has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[68] "Stockholder approval of a merger

---

A.3d at 1003; *accord In re Merge Healthcare Inc.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017).

[65] 125 A.3d at 306.

[66] *Id.* at 309.

[67] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020).

[68] *KCG*, 2019 WL 2564093, at *10 (internal quotation marks omitted) (quoting *Corwin*, 125 A.3d at 306).

under Section 251(h) by accepting a tender offer has the same cleansing effect as a vote in favor of that merger."[69]

Here, Plaintiff does not allege that the tender offer on the Acquisition was coerced or that the Acquisition failed to receive the approval of a disinterested majority of stockholders. Nor does Plaintiff assert that NEA was a conflicted controlling stockholder, which would preclude *Corwin* cleansing and subject the Acquisition, and the Individual Defendants, to entire fairness review.[70] Thus, the inquiry is whether "Plaintiff has pled facts from which one might reasonably conceive that the vote was not fully informed."[71] If Plaintiff makes such a showing,

---

[69] *English v. Narang*, 2019 WL 1300855, at *6 (Del. Ch. Mar. 20, 2019) (alterations and internal quotation marks omitted) (quoting *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE)), *aff'd*, 222 A.3d 581 (Del. 2019) (TABLE).

[70] As Vice Chancellor Laster has aptly explained:

> The *Corwin* decision states that the cleansing effect of a stockholder vote does not apply to a transaction subject to the entire fairness standard. But despite this phrasing, *Corwin* precludes cleansing only when entire fairness applies *ab initio* because of the presence of a conflicted controlling stockholder.

*Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 254 (Del. Ch. 2021) (citing *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016)). Plaintiff does not make such an argument and, in fact, has distanced himself from this position. *See* Hr'g Tr. 67:5–9 ("Defendants argue, again, this -- that, you know, for entire fairness we have to show that they dominated a control. That's not our theory. We don't -- we don't say to any -- there was a controller."); *see also* D.I. 38 at 60–61 (arguing that "the sale is subject to entire fairness review" but not arguing that NEA was a controller).

[71] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *8 (Del. Ch. Mar. 31, 2017) (citing *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7 (Del. Ch. Jan. 5, 2017)).

"*Corwin* will not apply, the business judgment rule will not be available to the Individual Defendants at the pleadings stage and enhanced scrutiny will be the standard of review."[72] If the stockholders were fully informed, the Motions must be granted with respect to Counts I and II because Plaintiff does not allege waste.[73]

In evaluating whether stockholders were fully informed, the Court must consider "whether the Company's disclosures apprised stockholders of all material information and did not materially mislead them."[74] "At the pleading stage, that requires [the Court] to consider whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[75] While defendants bear the ultimate burden of "demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction,"[76] a plaintiff challenging the transaction must "first identify a deficiency in the operative disclosure document."[77] If the plaintiff makes such a showing, "the burden [falls] to

---

[72] *Id.*

[73] *See id.* (citing *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016), and then citing *Volcano*, 143 A.3d at 750).

[74] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (citing *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018)).

[75] *Id.* (citing *Berkman*, 180 A.3d at 1064).

[76] *Volcano*, 143 A.3d at 748.

[77] *Solera*, 2017 WL 57839, at *8.

defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[78] This inquiry is necessarily "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law."[79]

The Delaware Supreme Court recently described the "materiality" standard in *Morrison v. Berry*:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Framed differently, an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. But, to be sure, this materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.[80]

---

[78] *Id.*

[79] *KCG*, 2019 WL 2564093, at *10 (compiling sources).

[80] 191 A.3d at 282–83 (footnotes and internal quotation marks omitted) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[81] The *Morrison* Court explained the standard for evaluating whether partial disclosures are materially misleading:

> As we said in *Arnold v. Society for Savings Bancorp, Inc.*, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . . they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." And, in *Zirn v. VLI Corp.*, we explained that, "even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[82]

To be sure, facts are not necessarily material simply because a stockholder may find them "helpful."[83] Delaware courts are cautious in "balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information."[84]

---

[81] *Id.* at 283.

[82] *Id.* (alterations in original) (footnotes removed) (quoting 650 A.2d 1270, 1280 (Del. 1994), and then quoting 681 A.2d 1050, 1056 (Del. 1996)).

[83] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014) ("Delaware law does not require information to be disclosed simply because that information might be helpful." (internal quotation marks omitted) (quoting *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000))).

[84] *Volcano*, 143 A.3d at 749 (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE)).

Counterbalancing the mandate for complete disclosure, of course, is recognition of the risk of inundating the stockholder with so much information that the proxy clouds, rather than clarifies, the stockholder's decision. A complaint does not state a disclosure violation by noting picayune lacunae or "tell-me-more" details left out.[85]

"One sufficiently alleged disclosure deficiency will defeat a motion to dismiss under *Corwin*."[86] Here, Plaintiff alleges four separate disclosure problems that, in his view, preclude *Corwin*'s application to the Acquisition. I address each in turn.[87]

### a. The November LRP Projections

Plaintiff's primary argument is that the Recommendation Statement omitted mention of projections from the November LRP and, instead, only disclosed that the Board considered Case A and Case B. Defendants argue that the November LRP projections included speculative projections regarding yet-undeveloped uses of Zejula to treat breast cancer and PROC, making them unreliable. Alternatively, Defendants argue that the minimal difference between the November LRP projections and the Case A projections renders further disclosure unnecessary.

---

[85] *Salladay v. Lev*, 2020 WL 954032, at *12 (Del. Ch. Feb. 27, 2020) (footnotes omitted) (compiling sources).

[86] *Mindbody*, 2020 WL 5870084, at *26.

[87] Defendants argue I should not consider Plaintiff's alleged disclosure deficiencies given that he waited until after the Transaction closed to assert them. "Given that I find each of the disclosure challenges to lack any merit, I decline to reach the issue of whether Plaintiff[] should be barred by waiver, laches or otherwise from raising disclosure deficiencies here." *In re Rouse Props., Inc.*, 2018 WL 1226015, at *22 n. 186 (Del. Ch. Mar. 9, 2018).

The Recommendation Statement included two full-page spreadsheets of Case

A and Case B projections through the year 2030.[88]  The Recommendation Statement

discussed these projections; first, in the context of the November 8 Meeting.

> On November 7 and 8, 2018, the Company Board convened a regularly-scheduled Company Board meeting.  Various members of the Company's management, along with representatives from Ropes & Gray, Hogan Lovells, Citi and Centerview attended the portion of the Company Board meeting at which the Company's financial projections were presented and discussed. Mr. Pearson presented the two sets of financial projections:  the Case A Forecasts and the Case B Forecasts (see "Certain Company Management Forecasts").  Representatives from Citi updated the Company Board on activities to determine potential interest in a strategic transaction involving the Company, and Citi and Centerview each discussed a preliminary financial analyses of the Company, based in part upon the Case A Forecasts and the Case B Forecasts.  Following these presentations, the Company Board discussed and considered the Company's capital requirements, potential business development and financing options, including the proposed synthetic royalty transaction with Party C, the Chinese Newco License, [GSK's] October 24 acquisition proposal and a plan for continued engagement with [GSK].[89]

In the section titled "Certain Company Management Forecasts," the

Recommendation Statement described the Case A and Case B projections:

---

[88] Kirby Decl. Ex. P at 59–60.

[89] *Id.* at 24.

In connection with its annual preparation of the Company's long-range plan, the Company's management prepared unaudited nonpublic prospective financial projections for the Company as a stand-alone company, without giving effect to the Merger, and adjusted for the probability of success of each Company product. These prospective financial projections were prepared and updated by the Company's management, and reviewed and discussed with the Company Board, from the summer of 2018 to November 2018. The Company Board used these prospective financial projections to assist in its decision-making process in determining to accept [GSK's] proposal to acquire the Company and were used by the Company's financial advisors in their respective opinions . . . .

The Case A Forecasts were prepared by the Company's management based on assumptions they believed to be optimistic, but achievable. The Case A Forecasts reflect numerous assumptions including, (i) the probability of success and regulatory approval, commercial launch success, market size, market share, competition, pricing, and reimbursement for each of the Company's products, including [Zejula and several proprietary molecules], and other immuno-oncology assets, (ii) research and development expenses, sales, general and administrative expenses, and other operating expenses, and (iii) other relevant factors relating to the Company's long-range strategic plan, as well as how certain of these assumptions and estimates may change over time. The foregoing is a summary of certain key assumptions and estimates and does not purport to be a comprehensive overview of all assumptions and estimates reflected in the projections prepared by Company management. . . .

The Case B Forecasts were prepared by the Company's management based on more conservative assumptions. Key assumption differences between the two cases include, for Case B, (i) reduced market share for the Company's products, including [Zejula and several proprietary molecules], and other immuno-oncology assets, (ii) lower PD-L1 testing rates and reduced time on therapy in certain indications for [Zejula], and (iii) lower operating expenses due to the lower revenue. For purposes of preparing the Case B Forecasts, the Company assumed that it would successfully implement a convertible note offering and several secondary equity offerings to raise aggregate net proceeds of approximately $1.19 billion over the next several years.[90]

The Recommendation Statement also included the bankers' full fairness opinions, which relied on and discussed Case A and Case B.[91] The Recommendation Statement did not disclose the figures projected in any iteration of the LRP, including the November LRP.

While there "is no *per se* duty under Delaware law to disclose . . . financial projections given to and relied upon by a financial advisor,"[92] Delaware law recognizes the value of projections to stockholders considering a cash-out transaction. As then-Vice Chancellor Strine observed in *In re PNB Holding Co. Shareholders Litigation*:

---

[90] *Id.* at 58.

[91] *Id.* at 30–47, 68–74.

[92] *See Dent*, 2014 WL 2931180, at \*11.

In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate. After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company.[93]

But even in a cash-out transaction, when stockholders are comparing cash on the table to their stock's potential upside, not every projection is material.[94] "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."[95] Because projections are inherently uncertain, materiality requires reliability: projections are typically material only if "the circumstances of their preparation support the conclusion that they are reliable enough to aid the

---

[93] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006).

[94] *See id.* at *16 ("The projections at issue fall into the category of documents that courts have referred to as 'soft information,' and the standard by which to determine whether or not soft information, such as pro formas and projections, must be disclosed has troubled courts and commentators. Projections of future performance are the kind of soft information that necessarily bespeaks caution, but they are also useful, particularly in the context of a cash-out merger. Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or however prepared, is material.") (footnotes omitted) (citing *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 127 (Del. Ch.1986)).

[95] *Arnold*, 650 A.2d at 1280.

stockholders in making an informed judgment."[96] As a general rule, management projections made in the ordinary course of business are reliable.[97]

Plaintiff argues that because the LRP projections were created in Tesaro's ordinary course of business, they are presumptively reliable and thus, their omission was material. While reliability is a prerequisite to materiality, it does not equate to materiality. Even reliable projections need not be disclosed if it is unlikely that doing so would "significantly alter[] the total mix of information" available to

---

[96] *PNB*, 2006 WL 2403999, at *16 (emphasizing that "[t]he word reliable is critical" to the materiality inquiry); *see also KCG*, 2019 WL 2564093, at *13 ("Thus, under *PNB*, if the circumstances surrounding the preparation of interim projections reveal them to be reliable enough to aid stockholders in making an informed judgment, they should be disclosed, regardless of whether they were the final projections relied upon by the Board. By logical extension, if the circumstances surrounding the preparation of final projections relied upon by the Board and disclosed to the stockholder cast doubt on their reliability, then those circumstances should be disclosed." (footnotes omitted) (citing *PNB*, 2006 WL 2403999, at *16)).

[97] *E.g.*, *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. July 9, 2004) ("When management projections are made in the ordinary course of business, they are generally deemed reliable." (citing *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490–91 (Del. Ch. 1991))), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005).

stockholders.[98]  When the difference between disclosed and undisclosed projections is insubstantial, this Court has declined to compel further disclosure.[99]

Even assuming the November LRP projections were reliable,  I cannot conclude that their omission was material because their inclusion would not have significantly altered the total mix of information available to Tesaro stockholders. The only difference between the November LRP projections and Case A is Case A's omission of two potential revenue streams (using Zejula to treat breast cancer and PROC) included in the November LRP.  Their elimination does not appear to have created a material difference between the projections, at least in the short term.  The following chart comes from the "LRP Case Review" presented to the Board,

---

[98] *See Morrison*, 191 A.3d at 283 (internal quotation marks omitted); *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *10 (Del. Ch. June 27, 2008); *Wayne Cty. Empls.' Ret. Sys. v. Corti*, 954 A.2d 319, 333 (Del. Ch. 2008); *see also In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511 (Del. Ch. 2010) ("Whether a particular piece of an investment bank's analysis needs to be disclosed, however, depends on whether it is material, on the one hand, or immaterial minutia, on the other."); *Saba Software*, 2017 WL 1201108, at *10 (same).

[99] *See Simonetti*, 2008 WL 5048692, at *10 ("Although including the more optimistic projections in the Proxy Statement and then explaining why they were not relied upon may have been somewhat helpful to stockholders, it is doubtful that any such additional disclosures would have materially altered the total mix of information provided."); *Corti*, 954 A.2d at 333 ("Plaintiff has not explained how receiving information in addition to the financial data already disclosed will significantly alter the total mix of information available, especially when plaintiff itself admits that the current projections are generally the same as those already disclosed." (footnotes, alterations, and internal quotation marks omitted) (quoting *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007))).

38

produced in the Section 220 Action, and referenced in the Complaint.[100]  It depicts

total annual revenue across the following projections, from highest to lowest:  the

"2018 LRP," the November LRP, Case A, and Case B.  The middle two lines, both

in shades of light grey, depict Case A and the November LRP.[101]



The November LRP projections and the Case A projections are nearly identical

through at least 2023 or 2024.  Their divergence is almost completely confined to

the second half of the ten-year projections, where the exact figures are inherently

more speculative.  At the height of this gap, the November LRP predicts only a

7.05% increase in total 2028 revenue over the Case A projections.[102]  Disclosing the

---

[100] *See* Kirby Decl. Ex. L at 4; Compl. ¶¶ 169, 177.

[101] *See* Kirby Decl. Ex. L at 4.

[102] *See id.*  This gap is larger than the delta between the August LRP and Case A, which was closer to 5.83% in 2028.  *See id..*

marginally higher projections in the November LRP would not have "significantly altered the total mix of information" available to Tesaro stockholders.[103] For the same reason, their omission was also not "materially misleading," as Plaintiff suggests.[104]

---

[103] *See Morrison*, 191 A.3d at 283 (internal quotation marks omitted).

A review of cases assessing the sufficiency of disclosed projections in light of higher, undisclosed projections reveals that a more substantial, more immediate difference is typically considered material, while smaller deltas are not. For example, in *Simonetti*, the Court concluded that disclosure of projections predicting 2.36% higher revenue in the year following the merger likely would not have significantly altered the total mix of information provided to stockholders. *See* 2008 WL 5048692, at *10 ("The Proxy Statement sets forth projections estimating full year 2008 revenues at $495.8 million; by way of comparison, [the undisclosed projection] estimates 2008 revenues at $507.5 million."); *see also Corti*, 954 A.2d at 333 (holding that undisclosed projections that are "generally the same as those already disclosed" were not material). By contrast, the cases on which Plaintiff relies address meaningfully different projections. In *City of Warren General Employees' Retirement System v. Roche*, for example, the Court found an omitted projection that included a substantial acquisition plan to be material. 2020 WL 7023896, at *21 (Del. Ch. Nov. 30, 2020). That plan "projected to add $98 million in yearly EBITDA" within three years of the challenged transaction, "representing approximately 25% of" the projected adjusted EBITDA for that year, as well as adding "$20 million in EBITDA," for the first year of projections, an approximately 8% increase in that year alone. *Id.* The Court concluded that omitting the acquisition plan altered the total mix of information available to stockholders considering a recommended buyout. *Id.*

The November LRP, which projected nearly identical revenue for five years before showing a slight deviation ten years out, looks more like the immaterial omission in *Simonetti* than the material omission in *Roche*. I do not mean to suggest any bright line rule keying alterations to the total mix of information to the delta between disclosed and undisclosed projections. And I acknowledge that comparing projections using different metrics (EBITDA vs. revenue) over different time periods (one year vs. ten years) is an imperfect analysis. But here, I do not believe a reasonable stockholder would find the November LRP projections important in deciding whether to tender her shares, or that disclosing them would have significantly altered the total mix of information available to Tesaro stockholders.

[104] Plaintiff also argues that the Recommendation Statement was materially misleading because it suggested that the Board considered two sets of projections (Case A and Case

40

Despite the relatively small gap between the November LRP and the Case A projections, Plaintiff concludes that had Citi and Centerview used the November LRP projections to analyze the transaction, "they could not have justified the Acquisition price," and thus, their omission is material.[105] This argument falls flat. While another set of inputs may have altered the fairness opinions' valuation ranges, "a complaint about the accuracy or methodology of a financial advisor's report is not a disclosure claim."[106] And though stockholders are entitled to a "fair summary" of a financial advisor's work, disclosures must "be sufficient for the stockholders to

B), but the "LRP Case Review" identified four sets of projections (Case A, Case B, the November LRP, and the August LRP). This argument fails for the same reason. Omitting mention of "the existence of more optimistic projections" that are themselves not substantially different from the projections discussed does not amount to a "materially misleading" disclosure and its inclusion would not have altered the total mix. *See Simonetti*, 2008 WL 5048692, at *9–10; *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 673736, at *6 (Del. Ch. Feb. 25, 2013) (discussing *Simonetti*).

Similarly, Plaintiff alleges the Recommendation Statement was misleading in suggesting that Case A and Case B were an evolution or iteration of the LRP, arguing in a footnote that all three projections were prepared contemporaneously. Compl. ¶¶ 188, 191 (quoting the Recommendation Statement); D.I. 38 at 18 n.2. Plaintiff's footnote falls short of proper briefing, such that this issue may be deemed waived. *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *20 (Del. Ch. Mar. 28, 2018). And Plaintiff has not demonstrated that the Recommendation Statement's explanation that management created the LRP, as well as Case A and Case B, was in any way false or misleading. *See* Kirby Decl. Ex. P at 58.

[105] Compl. ¶ 182.

[106] *Rouse*, 2018 WL 1226015, at *23 n. 194 (quoting *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *10 (Del. Ch. Oct. 16, 2013)); *Cty. of York Empls. Ret. Plan v. Merrill Lynch & Co., Inc.*, 2008 WL 4824053, at *11 (Del. Ch. Oct. 28, 2008); *In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 28 & n.52 (Del. Ch. 2004) ("Neither use of the purchase accounting method in this analysis, not mere disagreement with a financial advisor's chosen methodology creates a disclosure claim.").

usefully comprehend, not recreate, the analysis."[107]  Delaware law does not require disclosure of sufficient detail to "facilitate the recreation of a DCF analysis" or "to enable a stockholder to make an independent determination of fair value."[108]  The inquiry is whether the November LRP projections themselves were material to Tesaro stockholders.  Though they may have been helpful to a stockholder seeking to test Plaintiff's theory by recreating the DCF analyses, their omission from the Recommendation Statement was not material.

### b. Citi's Conflicts

Plaintiff contends the Recommendation Statement did not disclose the full extent of Citi's conflict of interest with GSK.  In particular, Plaintiff argues that Hite's work with GSK in June 2018 and Hite's simultaneous work on the GSK/Pfizer JV are undisclosed conflicts of interest.  For their part, Defendants point to the disclosures in the Recommendation Statement, which indicate that:  (1) Citi and its affiliates have provided and currently provide services to GSK unrelated to the Acquisition, (2) that Citi's "investment banking services" for GSK include "acting as a financial advisor in strategic transactions," and "providing market feedback and strategic advice," for which Citi has been and will be paid; and (3)

---

[107] *Saba Software*, 2017 WL 1201108, at *10 (quoting *Merge Healthcare*, 2017 WL 395981, at *10); *Rouse*, 2018 WL 1226015, at *23 n. 194 (Del. Ch. Mar. 9, 2018).

[108] *Rouse*, 2018 WL 1226015, at *22; *Dent*, 2014 WL 2931180, at *14 (noting that "this argument has been rejected explicitly by our Supreme Court" in *Skeen*, 750 A.2d at 1174).

over the past two years, Citi has received approximately $24.1 million in fees from GSK for its services.[109]  These disclosures are sufficient to inform Tesaro stockholders of Citi's conflict.

Both Citi's fairness opinion, and the Recommendation Statement itself, discussed Citi's potential conflicts of interest.  The Recommendation Statement disclosed:

> During the past two years, Citi has received approximately $24.1 million in fees for investment banking services provided to [GSK] and its affiliates.  Investment banking services include acting as financial advisor in strategic transactions to [GSK], including in connection with the acquisition of the remaining stake held by Novartis AG in their Consumer Healthcare Joint Venture, placement agent for [GSK] on a sale of equity that it owned of a third party, joint bookrunner for an unsecured note offering of [GSK], underwriter, bookrunner, mandated lead arranger and facility agent under a committed facilities agreement of [GSK], corporate broker providing market feedback and strategic advice to [GSK], and as a financial advisor providing markets and securities services, treasury and trade solution services and corporate portfolio management services to [GSK].
>
> In the ordinary course of its business, Citi and its affiliates may actively trade or hold the securities of [Tesaro] and [GSK] and affiliated entities for its own account or for the account of its customers and, accordingly, may at any time hold a long or short position in such securities.  In addition, Citi and its affiliates (including Citigroup Inc. and its affiliates) may maintain relationships with [Tesaro], [GSK] and their respective affiliates.[110]

Citi's fairness opinion elaborated:

---

[109] Kirby Ex. P at 39, 69.

[110] *Id.* at 39.

43

Citigroup Global Markets Inc. has acted as financial advisor to Tesaro in connection with the proposed Transaction and will receive a fee for such services, a significant portion of which is contingent upon the consummation of the Transaction. We also will receive a fee in connection with the delivery of this opinion. We and our affiliates in the past have provided, and currently provide, services to Tesaro and GSK unrelated to the proposed Transaction, for which services we and such affiliates have received and expect to receive compensation, including, without limitation, during the past two years, having acted or acting (i) as a lead bookrunner for follow-on offerings of Tesaro and as a financial advisor providing markets and securities services to Tesaro, and (ii) as financial advisor in strategic transactions to GSK, including in connection with the acquisition of the remaining stake held by Novartis in their Consumer Healthcare Joint Venture, placement agent for GSK on a sale of equity that it owned of a third party, joint bookrunner for an unsecured note offering of GSK, underwriter, bookrunner, mandated lead arranger and facility agent under a committed facilities agreement of GSK, corporate broker providing market feedback and strategic advice to GSK, and as a financial advisor providing markets and securities services, treasury and trade solution services and corporate portfolio management services to GSK. In the ordinary course of our business, we and our affiliates may actively trade or hold the securities of Tesaro and GSK for our own account or for the account of our customers and, accordingly, may at any time hold a long or short position in such securities. In addition, we and our affiliates (including Citigroup Inc. and its affiliates) may maintain relationships with Tesaro, GSK and their respective affiliates.[111]

The Recommendation Statement did not mention Citi's June 2018 presentation of public information on Tesaro to GSK, nor did it specifically identify the GSK/Pfizer JV.

"Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has

---

[111] *Id.* at 69.

required full disclosure of investment banker compensation and potential conflicts."[112] Disclosing conflicts is particularly important when the transaction in question did not involve a public option, and so "shareholders may be forced to place heavy weight upon the opinion of" a financial advisor.[113] In that context, "[i]t is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the financial advisor."[114]

> The financial advisor's opinion of financial fairness for a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders and, in turn, for the stockholders' decisions on the appropriateness of the transaction. Thus, it is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.[115]

When a financial advisor faces a conflict, this Court has generally required disclosure of the relationship itself and the amount of fees the advisor received.[116] It

---

[112] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011).

[113] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009) (internal quotation marks omitted) (quoting *Braunschweiger v. Am. Home Shield Corp.*, 1991 WL 3920, at *6 (Del. Ch. Jan. 7, 1991)).

[114] *Id.*

[115] *Simonetti*, 2008 WL 5048692, at *8.

[116] *E.g.*, *Saba Software*, 2017 WL 1201108, at *11 ("What was material, and disclosed, was the prior working relationship and the amount of fees."); *see also Rouse*, 2018 WL 1226015, at *24 n. 203 (compiling sources).

45

has rejected requests for more granular details about the "specific services rendered" by the advisor,[117] or overlapping deal team members.[118]

The Recommendation Statement sufficiently informs stockholders about Citi's potential conflict of interest with GSK. It discloses that Citi has represented and still represents GSK on a variety of matters, and listing several of the services Citi provides.[119] In addition to disclosing the existence of the conflict and the general nature of Citi's work with GSK, the Recommendation Statement disclosed the specific amount of fees GSK paid Citi over the last two years.[120]

Identifying Hite by name was unnecessary. In *David P. Simonetti Rollover IRA v. Margolis*, this Court rejected a similar argument that overlapping deal team members should be disclosed.[121] Because the proxy statement disclosed the nature of the conflict faced by the bank itself, the *Simonetti* Court held that "[n]o further disclosures on this point would have altered the total mix of information available, *viz.*, that the same investment bank had represented parties with opposed interests in

---

[117] *Saba Software*, 2017 WL 1201108, at *11.

[118] *Simonetti*, 2008 WL 5048692, at *7.

[119] Kirby Ex. P at 39, 69.

[120] *Id.*

[121] *See* 2008 WL 5048692, at *7.

46

the Merger in temporal proximity."[122]  Here, too, the disclosures of Citi's relationship with GSK were sufficient without identifying Hite.

Information on Citi's ongoing relationship with GSK in the context of the GSK/Pfizer JV also exceeds what is necessary to disclose.  Tesaro disclosed that Citi was continuing to represent GSK in unrelated matters.[123]  As in *In re Saba Software, Inc. Stockholder Litigation*, more information about the "specific services" Citi rendered, including identifying the then-confidential GSK/Pfizer JV,[124] would likely not have substantially altered the total mix of information available to stockholders.[125]

Plaintiff argues that the Recommendation Statement should have, but did not, disclose that Citi included Tesaro in June 2018 pitches to GSK.  Citi's Conflict Presentation, which is consistent with the Complaint, explains this meeting was not a specific pitch to buy Tesaro, but rather one of several regular "strategic discussions" in which Tesaro was among a broad swath of potentially available oncology targets identified using "public marketing valuation materials."[126]  The

---

[122] *Id.*

[123] Kirby Ex. P at 39, 69.

[124] Kirby Ex. M at 4, 6.

[125] 2017 WL 1201108, at *11.

[126] Compl. ¶ 158; Kirby Decl. Ex. M at 6 (stating that "[a]ny references to [Tesaro] were based solely on public information").

Complaint does not allege this overview presentation suggested any particular transaction or the terms of any such transaction. Citi's presentation falls far short of the material undisclosed communications in *Chester County Employees' Retirement. Fund v. KCG Holdings., Inc.*,[127] *In re PLX Technology Inc. Stockholders Litigation*,[128] and *In re John Q. Hammons Hotels Inc. Shareholder Litigation*,[129] which Plaintiff invokes. The communications in *KCG* and *PLX* were substantially more involved, and shared crucial, non-public information.[130] *Hammons*, which involved the target's financial advisor's undisclosed pitch to secure other business

---

[127] 2019 WL 2564093.

[128] 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019).

[129] 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009).

[130] In *KCG*, the proxy suggested that the buyer had made a "vague or undeveloped" proposal to divest certain of the target's assets upon completing a transaction. *KCG*, 2019 WL 2564093, at *11. The plaintiff alleged that the divestiture plan was far from undeveloped and, in fact, had been developed by the buyer and the target's financial advisor in advance. *See id.* To help buyer develop that plan, thus facilitating the merger, the financial advisor provided specific, confidential information to the buyer in advance, a fact which the proxy omitted. *See id.* at *4, 11. The Court concluded that the omission of this information rendered the proxy materially misleading, since the proposal was not vague or undeveloped. *See id.* at *11–12. The undisclosed communication in *PLX* was similarly laden with insider information. 2018 WL 5018535, at *32–35. There, a representative from a potential bidder tipped off the target's financial advisor of the price it planned to pay, and when it planned to make its bid. *Id.* at 33. The tip made it back to an activist investor, who was pressuring the target to sell. *Id.* Later, the activist investor and the bidder's representative held substantial undisclosed price discussions over dinner. *Id.* 33–34.

Here, the allegations to not rise to the same level of severity. Disclosure of the details of Citi's June 2018 presentation, which included only public information (unlike *KCG*), and did not discuss the details of a potential transaction (unlike *PLX*), would not have "substantially altered the total mix" of information available to Tesaro stockholders.

48

from the buyer, is also distinguishable.[131] There, no conflict had been disclosed at all, so disclosure of the pitch was necessary to inform the target's stockholders of the relationship in the first instance.[132] The Recommendation Statement adequately disclosed Citi's work with GSK.

### c. Mott's and NEA's Liquidity Conflicts

The Recommendation Statement disclosed that Mott is a general partner of NEA; that NEA 13 and NEA 15 owned 9,681,039 and 739,516 shares of Tesaro stock, respectively; and that the NEA funds had already agreed to tender its shares.[133] Plaintiff argues that the Recommendation Statement materially omitted that NEA, and by extension, Mott as an NEA partner, "had a unique interest in selling Tesaro before year-end 2018[, which] would have been material to Tesaro's stockholders as it would have raised questions about, among other things, the rushed single bidder process."[134] Defendants attack both the viability of Plaintiff's liquidity conflict theory in general, and whether that specific conflict needed to be disclosed.

---

[131] 2009 WL 3165613, at *16.

[132] *See id.*

[133] *See* Kirby Decl. Ex. P at 5–6, 15.

[134] Compl. ¶ 203. While Plaintiff has alleged that other board members had ties to NEA, Plaintiff's disclosure issue is specifically trained on Mott. *See id.* ¶¶ 69, 202–03, 230–31. Plaintiff does not assert any disclosure shortcomings in regard to Patel, an NEA venture partner.

Generally, stockholders are entitled to know whether their fiduciaries face conflicts of interest.[135] To plead that a fiduciary is conflicted, a plaintiff must "allege facts that support a reasonable inference of a divergent interest, regardless of the source, that rises to the level of a disabling conflict."[136] This Court has recognized several potential sources of divergent interests, including more or different consideration, or other uniquely valuable incidental benefits that may flow to a fiduciary in a transaction.[137]

Plaintiff asserts NEA, and Mott by extension, sought and obtained the unique benefit of liquidity for NEA. Specifically, Plaintiff asserts NEA sought a sale of Tesaro by the end of 2018 to boost NEA 13 returns in support of fundraising and

---

[135] *E.g.*, *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) ("Under Delaware law, stockholders are entitled to know that certain of their fiduciaries have a self-interest that is arguably in conflict with their own." (alterations and internal quotation marks omitted) (quoting *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987))); *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price."); *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 860 n.157 (Del. 2015) (quoting *Lear*, 926 A.2d at 114); *In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *33–34 (Del. Ch. Mar. 1, 2021) (quoting *Lear*, 926 A.2d at 114).

[136] *Presidio*, 251 A.3d at 256.

[137] *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *17 (Del. Ch. Aug. 16, 2021).

50

fees for NEA 17. Plaintiff's theory is not new.[138] In general, this Court has been skeptical of liquidity-driven conflict theories.

> Delaware courts have been reluctant to find that a liquidity-based conflict rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration. To reach such a conclusion requires the court to make the extraordinary inference that rational economic actors have chosen to short-change themselves in favor of liquidity. Accordingly, in most cases, a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally.[139]

Given these concerns, it is unsurprising that "liquidity-driven theories of conflicts can be difficult to plead."[140]

Building on his decision rejecting a liquidity conflict theory in *In re Synthes, Inc. Shareholder Litigation*,[141] then-Chancellor Strine addressed a liquidity conflict allegedly faced by a company's private equity sponsor in *In re Morton's Restaurant Group, Inc. Shareholders Litigation*.[142] Like this case, *Morton's* presented the theory that the company's private equity sponsor, which was not a controlling

---

[138] *See Mindbody*, 2020 WL 5870084, at *15 n. 117, *18 n. 156 (compiling sources).

[139] *Presidio*, 251 A.3d at 256 (citations, alterations, and internal quotation marks omitted) (quoting *Larkin*, 2016 WL 4485447, at *16, and then quoting *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012)).

[140] *Mindbody*, 2020 WL 5870084, at *18.

[141] 50 A.3d 1022. Last year, then-Vice Chancellor McCormick explained the "hyperbolic" "fire sale" language in *Synthes* "is best read in the context it was issued," not to establish a general rule. *Mindbody*, 2020 WL 5870084, at *17 (citing *Synthes*, 50 A.3d at 1037).

[142] 74 A.3d 656 (Del. Ch. 2013).

stockholder but held two out of ten board seats, had life-cycle-driven reasons to liquidate its position.[143]

The sponsor in *Morton's* allegedly "pressured the board to sell Morton's quickly" so that it could "get some liquidity to reinvest in its new [fund], or so [it] could cash out the investors in [its old fund] and those investors would have money to reinvest in [the private equity sponsor's] new [f]und."[144] Despite allegations that the private equity sponsor's typical life cycle involved periodically and systematically liquidating its position to finance new investments and raise new funds, the Court rejected the theory.[145] It noted the plaintiff's theory would require finding a conflict "whenever [a private equity company] is in the process of starting a new investment fund," a "hardly unique" position that did not dislodge the presumptions that large blockholders and board members are incentivized to maximize share value in a change of control transaction.[146]

While the parties were briefing the Motions, this Court again rejected sponsor life cycle cyclicality as a source of conflict in *Firefighters' Pension System of City*

---

[143] *Id.* at 661–62, 667–68.

[144] *Id.* at 667.

[145] *Id.* at 667–68.

[146] *Id.* (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1380–81 (Del. 1995)); *see also id.* at 670–72 (explaining alignment between private equity firm incentives and other target stockholders).

*of Kansas City, Missouri Trust v. Presidio, Inc.*[147] *Presidio* addressed the theory that the target's private equity sponsor and controlling stockholder, Apollo, "wanted to sell because under its private equity business model, the time had come for Apollo to harvest its investment in the Company."[148] Like *Morton's* before it, *Presidio* rejected the plaintiff's theory that Apollo faced a debilitating conflict.[149]

> It is true that investment fund managers cycle through a multi-year process of raising capital for a new fund, launching the fund, investing the fund's capital, managing the investments, and then harvesting the investments. Investment managers may manage multiple funds at different stages, and they often raise or at least prepare to raise a new fund while in the harvesting stage for an old fund.
>
> The desire to wrap up an existing fund or to provide potential investors with attractive realizations while raising a new fund can affect a fund manager's approach to achieving liquidity for an investment. The cyclical process, however, is not so formulaic and structured that the cycle itself would support an inference of a liquidity-based conflict. Instead, this court has reasoned that because investment managers cyclically raise and liquidate funds on a somewhat predictabl[e] schedule, the pattern suggests that the monetization phase does not necessarily create a problematic interest.[150]

---

[147] 251 A.3d 212 (Del. Ch. 2021).

[148] *Presidio*, 251 A.3d at 257.

[149] *Id.* at 257 & n.10 (citing *Mindbody*, 2020 WL 5870084, at *34, then citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *19 (Del. Ch. Oct. 24, 2014), then citing *Morton's*, 74 A.3d at 667, and then citing *Chen v. Howard-Anderson*, 87 A.3d 648, 671–72 (Del. Ch. 2014). Like *Mindbody*, but unlike *Morton's*, *Presidio* did not cabin a potential liquidity conflict to the extreme circumstances described in *Synthes*.

[150] *Id.* at 257–58 (footnote omitted) (citing *Larkin*, 2016 WL 4485447, at *15–16).

Earlier this month, Vice Chancellor Slights summarized *Presidio* as standing for the proposition that "the cyclicality of private equity funds, by itself, [does] not give rise to a liquidity-based conflict."[151]

Plaintiff here seeks the "extraordinary inference" that NEA, a Tesaro stockholder that received the same Acquisition consideration as all other stockholders, had an interest in "short-chang[ing] [itself] in favor of liquidity" due to its investment life cycle and business model.[152] Plaintiff's inference rests on shaky ground, as evidenced by *Morton's*, *Presidio*, and others.[153]

In assessing Plaintiff's conflict theory, it is important to remain oriented to the task at hand: considering whether that conflict had to be disclosed to stockholders for their votes to be fully informed under *Corwin*. Plaintiff argues NEA's liquidity interests are divergent from Tesaro stockholders' interests in value, and because

---

[151] *Flannery*, 2021 WL 3615540, at *18.

[152] *Presidio*, 251 A.3d at 256 (internal quotation marks omitted) (quoting *Larkin*, 2016 WL 4485447, at *16).

[153] *See Presidio*, 251 A.3d at 256–58; *Morton's*, 74 A.3d at 667–69 (Del. Ch. 2013); *see also Synthes*, 50 A.3d 1022, 1035–36 (Del. Ch. 2012); *Crimson Expl.*, 2014 WL 5449419, at *19; *Chen*, 87 A.3d at 671–72. Plaintiff seizes on one of the factual deficiencies in the *Presidio* conflict allegations, where the plaintiff alleged only the controller's need for a "near-term" sale, rather than a need for a sale by a particular date or general time period. *Presidio*, 251 A.3d at 258. Plaintiff argues he has specifically established that NEA needed a sale by the end of 2018 to bolster its NEA 17 fundraising efforts. While *Presidio* noted that the timing deficiency there was important, it also identified several other places where the allegations fell short. *See id.* at 256–60. Even with Plaintiff's added detail, I remain skeptical that Plaintiff's liquidity conflict theory here is meaningfully different than the theory rejected in *Presidio* and its forebears.

54

NEA's liquidity interests were not disclosed, the stockholders were not informed and their vote did not cleanse Tesaro's sale. It is important to remember that Plaintiff has disclaimed any argument that NEA is a controller: it was not a fiduciary and did not have its own power to pressure or force Tesaro's sale.[154] The Board was under no obligation to disclose the business model of a minority stockholder, even if that model conflicted with the pursuit of value. Whether NEA was conflicted is not material on a standalone basis.

Rather, NEA's interests are only relevant insofar as they inform whether *Mott* was conflicted.

> As in all matters of public disclosure, materiality is the touchstone of the board's disclosure duty. This is true with respect to the disclosure of director conflicts. And not every fact tending remotely to suggest that a board member's interest might differ in some respect from that of the stockholders amounts to a material omission. Plaintiffs must allege facts from which the Court may reasonably infer that there is a substantial likelihood that a reasonable shareholder would consider the omission important in deciding how to vote.[155]

Materiality is a case-specific endeavor.[156]

---

[154] *See* Hr'g Tr. 67:5–9; D.I. 38 at 60–61. Plaintiff presents only conclusory allegations that Mott took action on NEA's behalf. *See* Compl. ¶¶ 230–31.

[155] *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *15 (Del. Ch. Oct. 12, 2016) (footnotes, alterations and internal quotation marks omitted) (quoting *Rosenblatt*, 493 A.2d at 944 (Del. 1985)).

[156] *See Highland Cap., Inc. v. Longview Fibre Co.*, 1990 WL 3973, at *5 (Del. Ch. Jan. 22, 1990).

The Recommendation Statement disclosed Mott was a dual fiduciary to both NEA and Tesaro.[157] The Recommendation Statement specifically states that Mott is a general partner at NEA; it goes on to explain that NEA holds a substantial number of shares and planned to tender them in the Acquisition.[158] Stockholders were told Mott's dual fiduciary status, and his competing principal's identity and directional decision on the tender offer. The fact of Mott's conflict was disclosed.

Plaintiff seeks more. Plaintiff asserts NEA's liquidity interests, filtered through Mott, were material to stockholders understanding and questioning "the rushed single-bidder process" that led to the Acquisition.[159] Even assuming NEA has divergent liquidity interests, those specific interests do not add to the total mix of stockholder information about Mott or the sale process, because neither Mott nor NEA is alleged to have participated in the Acquisition process in any specific or

---

[157] *See Weinberger v. UOP*, 457 A.2d 701, 710–11 (Del. 1983) (discussing the "dual fiduciary" problem). In evaluating whether a dual fiduciary faces a conflict, the Court looks to the two principals' interests: "[i]f the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest. But if the interests of the beneficiaries are aligned, then there is no conflict." *Chen*, 87 A.3d at 670 (Del. Ch. 2014) (footnotes omitted) (citing *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991)); *see PLX*, 2018 WL 5018535, at *40 (quoting *Chen*, 87 A.3d at 670); *Presidio*, 251 A.3d at 284 (Del. Ch. 2021) (citing *Chen*, 87 A.3d at 670); *see also In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 47 (Del. Ch. 2013).

[158] *See* Kirby Decl. Ex. P at 6.

[159] Compl. ¶ 203. For purposes of this analysis, I accept Plaintiff's description of Tesaro's sale process.

remarkable way.[160]   The Complaint does not allege that Mott contributed to any deficiency in the sales process, or that NEA was involved at all.[161]   Rather, the Complaint places blame squarely on Citi, Hite, and Tesaro management.[162] Similarly, the Recommendation Statement does not indicate that Mott had any substantial role in negotiating the Acquisition.[163]   In this case, absent any allegation of bad acts, or even any act at all, further detail about the depths of Mott's allegedly bad intentions is immaterial.[164]

---

[160] This is despite the benefit of documents from the Section 220 Action.   While the Complaint repeatedly alleges that it would have been in NEA's interests to "engineer" a near-term sale, *e.g.*, Compl. ¶¶ 3, 81, 107, 141, 159, it stops conspicuously short of alleging that NEA (or Mott) did so.   Indeed, there are no allegations that Mott participated in the process at all.   *See* Hr'g Tr. 75:3–76:8.   The closest the Complaint comes to pleading facts suggesting Mott's or NEA's involvement is the allegation that "[i]nferably, Mott knew that Tesaro management had provided Hite with valuation materials for delivery to GSK." Compl. ¶ 159.   Putting aside the problems of pleading an "inference," Mott's knowledge of Citi's June 2018 presentation of public information does not suggest any wrongdoing. Nor do Plaintiff's allegations that NEA and GSK crossed paths in other investments, and that one of Mott's former colleagues at NEA had served as a consultant to GSK.   *See id.* Plaintiff's bare allegation that Mott "used his personal and professional connections to engineer the Acquisition" is unsupported and conclusory.   *See id.* ¶ 230.

[161] *See id.* ¶ 203.

[162] *E.g.*, *id.* ¶¶ 5, 157–76; *see also id.* at 58 ("Citi's Hite Arranges the Acquisition and Deceives the Board").

[163] *See* Kirby Decl. Ex. P at 16–27.   The only mentions of Mott during the negotiation process were two meetings he attended with representatives from "Party C" and "Party D" regarding potential business combinations.   *See id.* at 20, 22.   Plaintiff does not assert the Recommendation Statement was incomplete on this topic.

[164] *See Morrison*, 191 A.3d 268 at 283–84 (holding that omitted "troubling facts regarding director behavior" during the sale process were material because their inclusion "would have helped the stockholder reach a materially more accurate assessment of the probative value of the sale process"); *OM Gp.*, 2016 WL 5929951, at *16 ("Plaintiffs do not allege that . . . Demetriou controlled or had undue influence over any other members of the OM

57

### d. Valuation Information For The BMS Collaboration And RP Royalty Transaction

Finally, Plaintiff complains that the Recommendation Statement omitted Citi and Centerview's valuation analyses for the BMS Collaboration and the RP Royalty transactions. This contention also fails to demonstrate Tesaro stockholders were not fully informed when they tendered their shares. The Recommendation Statement disclosed that the Board explored several strategic transactions with anonymized parties that would not have required a sale.[165] It described in some detail the negotiations surrounding those transactions and some proposed terms.[166]

---

Board. Plaintiffs' conclusory allegation that 'Demetriou was influenced to support the Transaction' due to his 'pre-existing relationship with OM's counterparty Apollo' does not make it reasonably conceivable that this information should have been inserted in the Proxy or, if it was included, that it would have changed the total mix of information available to investors or would be important to a reasonable investor in deciding how to vote her shares. Thus, . . . without even the slightest indication much less allegation that Demetriou could exercise undue influence over the other indisputably independent members of the OM Board, I cannot accept Plaintiffs' contention that the omission of facts relating to the Demetriou 'conflict' was material."); *see also Morton's*, 74 A.3d at 667 (rejecting liquidity conflict theory where "plaintiffs have essentially admitted that [the private equity sponsor] did not cause [the company] to be sold at less than fair market value in a rushed fire sale, but that it simply supported the sale of the company after a full and unhurried market check."); *Columbia Pipeline*, 2021 WL 772562, at *34 & n.11 (noting that "precedents support the materiality of information that sheds light on the financial incentives and motivations of key members of management who are involved in negotiating the deal" and compiling sources).

[165] *See* Kirby Decl. Ex. P at 17–25.

[166] *See id.*

As discussed above, stockholders considering a proposed merger "are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender offer rely."[167]  But "Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing."[168]  And a disclosure claim will not be supported where it "boil[s] down to an argument that plaintiff disagreed with a Special Committee's decision not to pursue another acquisition proposal and that other stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee."[169]  As then-Chancellor Chandler observed in *In re 3Com Shareholders Litigation*, "Delaware law does not require management to discuss the panoply of possible alternatives to the course of action it is proposing."[170]  Nor does it "mandate the disclosure of every conceivable valuation

---

[167] *Saba Software*, 2017 WL 1201108, at *10 (quoting *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002)).

[168] *City of Miami Gen. Empls.' v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016); *see also Simonetti*, 2008 WL 5048692, at *12 ("In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required.").

[169] *OM Gp.*, 2016 WL 5929951, at *14 (internal quotation marks omitted) (quoting *Comstock*, 2016 WL 4464156, at *15).

[170] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (alterations and internal quotation marks omitted) (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *5 (Del. Ch. Dec. 5, 1984).

datum, method, or alternative."[171] This "settled guidance" is justified because "stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose."[172]

Plaintiff's "tell me more" claims for the specific valuation ranges for the BMS Collaboration and RP Royalty transactions do not present any reason to deviate from this general rule. As in *3Com*, Tesaro management did not need "to discuss the panoply of possible alternatives to the course of action it is proposing."[173] Indeed, the Recommendation Statement here went further than the disclosure in *3Com*, disclosing the existence of several alternatives, as well as general information about their terms and how they were negotiated.[174] In deciding whether to "veto" the

---

[171] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *13 (Del. Ch. Jan. 3, 2013).

[172] *3Com*, 2009 WL 5173804, at *6; *Saba Software*, 2017 WL 1201108, at *13 (describing the general rule from *3Com* as "settled guidance").

[173] *See 3Com*, 2009 WL 5173804, at *6 (quoting *Seibert*, 1984 WL 21874, at *5 (internal quotation marks omitted)).

[174] *See, e.g.*, Kirby Decl. Ex. P at 17–25 (discussing, among other things, potential Zejula co-development/co-promote transactions with several anonymized parties). While the Complaint does not match these anonymous parties with the BMS Collaboration or the RP Royalty transactions, it appears the Recommendation Statement disclosed these transactions. Party A's proposed "global collaboration for the development and commercialization of [Zejula]," providing for "total potential payments of $1.79 billion split between upfront payments and potential contingent milestone payments," in exchange for a share of "certain commercialization profits and losses of [Zejula], and . . . certain ZEJULA development expenses" appears to be the BMS Collaboration. *Id.* at 22. According to the Recommendation Statement, Party A's proposal, like BMS's, ultimately proposed payments up to $2.34 billion. *Id.* at 23; Compl. ¶ 145. Party C's proposed "synthetic royalty transaction," which would provide "$300 million of financing in

60

Acquisition, Tesaro stockholders did not need information about "every conceivable valuation datum, method, or alternative."[175]

Plaintiff relies on *Saba Software* for the proposition that "a reasonable stockholder would have needed to understand what alternatives to the Merger existed."[176] The exception carved out in that unique case is not applicable here. After noting that *3Com*'s general rule "holds true in a typical case," the *Saba Software* Court acknowledged that "this is hardly a typical case given the deregistration of Saba's shares by the SEC just prior to the time the stockholder vote on the Merger was to occur."[177] Because of the "fundamental change to the nature and value of the stockholder's equity stake" caused by the deregistration, and the impact that process had on "the environment in which the Board conducted the sales process and in which stockholders were asked to exercise their franchise," the *Saba Software* Court cautioned that "[t]he Board needed to take extra care to account for this dynamic in its disclosures to stockholders."[178] Based on these extenuating

---

exchange for royalties and milestone payments on the Company's immuno-oncology assets, as well as an equity investment in the Company at a premium to the then trading price of the Company's common stock" appears to be the RP Royalty deal. *See* Kirby Decl. Ex. P at 20–21. In addition to the quoted excerpts, the Recommendation Statement discusses some of the surrounding negotiations of these transactions through November 2018.

[175] *See Novell*, 2013 WL 322560, at *13.

[176] D.I. 38 at 77 (quoting 2017 WL 1201108, at *13).

[177] *Saba Software*, 2017 WL 1201108, at *13.

[178] *Id.*

circumstances, the Court held: "[i]n considering whether or not Saba was viable as a going-concern without the Merger, a reasonable stockholder would have needed to understand what alternatives to the Merger existed."[179]

Those extraordinary circumstances are not present here. While Tesaro, like many companies, needed additional cash to fuel its ambitious long-term plans, there is no allegation that the company's viability as a going concern was ever in question. In this much more typical case, further disclosure about potential strategic alternatives was not required. Armed with sufficient information about the proposed Acquisition, and aware that the Board had considered and rejected other alternatives, Tesaro stockholders were more than adequately positioned to consider whether to veto the Acquisition.

### 2. Because Counts I And II Do Not Plead Waste, They Must Be Dismissed.

For the foregoing reasons, I am satisfied that Plaintiff has failed to plead that the stockholders' decision to tender their shares was not fully informed. Plaintiff does not argue that decision was coerced or that a conflicted controlling stockholder put the Acquisition beyond *Corwin*'s reach.

---

[179] *Id.*

> The legal effect of a fully-informed stockholder vote of a transaction with a non-controlling stockholder is that the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste, even if a majority of the board approving the transaction was not disinterested or independent. As our Supreme Court explained, the long-standing policy of Delaware law has been to avoid the uncertainties and cost of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.[180]

Given *Corwin*'s application here, "the only claim Plaintiff[] could state that would overcome application of the business judgment rule is a claim for waste."[181] Plaintiff has not attempted to plead that claim. Thus, the Individual Defendants' Motion is granted with respect to the breach of fiduciary duty claims in Counts I and II.

## B. Counts III and IV: Aiding and Abetting

Count III alleges NEA aided and abetted the breaches of fiduciary duty alleged against the Individual Defendants. Count IV similarly alleges Citi aided and abetted those breaches.

> To plead a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach. An adequate pleading of knowing participation requires a pleading of scienter.[182]

---

[180] *GGP*, 2021 WL 2102326, at *34 (alterations and internal quotation marks omitted) (quoting *KKR*, 101 A.3d at 1001, and then quoting *Corwin*, 125 A.3d at 313).

[181] *Rouse*, 2018 WL 1226015, at *25 (citing *Volcano*, 143 A.3d at 741).

[182] *RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *5 (Del. Ch. Apr. 5, 2018) (internal quotation marks omitted) (quoting *RBC Cap. Mkts.*, 129 A.3d at 861, and then quoting

"An aiding and abetting claim may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants."[183]  Lacking a well-pled predicate breach of fiduciary duty, the Complaint does not state a claim for aiding and abetting.  The NEA Motion is granted with respect to Count III and the Citi Motion is granted with respect to Count IV.

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motions are **GRANTED**.

---

*Cumming v. Edens*, 2018 WL 992877, at *26 (Del. Ch. Feb. 20, 2018)); *see also Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[183] *KKR*, 101 A.3d at 1003 (internal quotation marks omitted) (quoting *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *2 (Del. Ch. Jan. 17, 1991)); *see also Volcano*, 143 A.3d at 750.